**TURNER GREENBERG ASSOCI-ATES, INC., Plaintiffs/Coun-ter–Defendants,**

v.

**C & C IMPORTS, INC., d/b/a/ Nancy Corzine, Defendant/Counter–Plaintiff,**

v.

**Steve Turner and Janet Greenberg, Counter–Defendants.**

**No. 96–6057–CIV–COHN.**

United States District Court, S.D. Florida.

March 29, 2004.

**3.** Pending discovery. *See* Amended Defendant's Response to Plaintiff's Motion to Dismiss at p. 9.

Jill Nexon Berman, Berman Rennert Vogel & Mandler, Miami, FL, for Plaintiff.

Gordon John Evans, Coral Gables, FL, for Defendant and Counter–Defendants.

Barry L. Haley, Cristina Pinheiro–Palmer, Malin Haley & DiMaggio, Mark Andrew Levy, Brinkley McNerney Morgan Solomon & Tatum, Fort Lauderdale, FL, Dyanne Elyce Feinberg, Lawrence Robert Heller, Gilbride Heller & Brown, Miami, FL, for Defendant and Counter–Claimant.

Jay M. Coggan, Los Angeles, CA, for Defendant.

Michael S. Pasano, Zuckerman Spaeder Taylor & Evans, Miami, FL, for Counter–Defendants.

Kevin Patrick Crosby, Brinkley McNerney Morgan Solomon & Tatum, Fort Lauderdale, FL, for Counter–Claimant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

COHN, District Judge.

This matter came before this Court for nonjury trial on January 12, 2004. The matter originally came to trial in April of 1999 before the Honorable Norman C. Roettger. Plaintiffs/Counter–Defendants Turner Greenberg Associates, Inc. ("Turner Greenberg"), Janet Greenberg and Steve Turner brought an action for commissions owed. Defendant/Counter–Plaintiff C & C Imports, Inc. ("C & C") raised affirmative defenses of breach of contract and conversion and filed a counterclaim which again raised the issues of breach of contract and conversion and added claims for unfair competition, false designation of origin and palming off, common law trademark infringement, unfair trade practices, common law fraud and constructive fraud.

On April 7, 1999, following a trial on Plaintiffs/Counter–Defendants' complaint, Judge Roettger issued findings from the bench concluding that Plaintiffs/Counter–Defendants were owed commissions and that they wrongfully held furniture on consignment from Defendant/Counter–Plaintiff. Judgment was entered on behalf of Plaintiffs/Counter–Defendants in the amount of $ 54,703. In addition, Plaintiffs/Counter–Defendants were ordered to return the withheld furniture.

Immediately after issuing findings of fact from the bench, the trial of the counterclaim commenced. In its opening statement, Defendant/Counter–Plaintiff made no mention of the breach of contract or conversion claims. Plaintiffs/Counter–De-fendants stated in its opening that "Plaintiffs have a 7 count counter claim which they have pled against Turner Greenberg and Janet Greenberg and Steve Turner individually. 2 of the counts are the same as the affirmative defenses which they pled in their answer on the contract case, that being a breach of contract and conversion, so I will not discuss them." (1999 Tr. 358). Although Defendant/Counter–Plaintiff began presentation of its case, the trial recessed before a conclusion was reached.

When the trial resumed before Judge Roettger on February 18, 2003, the parties questioned whether the breach of contract and conversion issues raised by Defendant/Counter–Plaintiff's counterclaim were subsumed in the Court's April 7, 1999 ruling. (2003 Tr. 6–23). Judge Roettger issued no determination at that time. Defendant/Counter–Plaintiff withdrew its claims under the Florida Unfair Trade Practices Act and constructive fraud prior to the commencement of trial. (2003 Tr. 9, 19). The trial concluded on February 20, 2003 and Judge Roettger took the matter under advisement.

On August 12, 2003, the case was transferred to the undersigned on the untimely death of Judge Roettger. On August 29, 2004, a status was held wherein the parties requested a retrial before the undersigned. This Court conducted a nonjury trial from January 12 through 14, 2004. Upon consideration of the entire record, the Court makes the following findings.

### FINDINGS OF FACT

C & C is a corporation organized under the laws of California, of which Nancy Corzine is the sole shareholder and CEO. (2004 Tr. 15). Since as early as 1983, C & C has manufactured and sold throughout the United States and abroad furniture, fabrics, and furniture accessories under the mark NANCY CORZINE. (2003 Tr.

107, 2004 Tr. 15) C & C sells its product through a network of geographically exclusive designer showrooms around the United States. (2004 Tr. 15).

Turner Greenberg is a Florida corporation that sells furniture, fabrics, and furniture accessories manufactured by different suppliers. Steve Turner and Janet Greenberg are Turner Greenberg's principals. (1999 Tr. 25, 106, 107).

C & C has used the mark NANCY CORZINE on hang tags and labels affixed to articles of furniture (C & C Ex. 169) sold throughout the United States, including the State of Florida, since the mid 1980s (2003 Tr. 102, 103), and has continuously used the mark NANCY CORZINE in advertising and catalogs also circulated throughout the United States, including the State of Florida, since prior to 1993. (2004 Tr. 86) All of the NANCY COR-ZINE items on the Turner Greenberg showroom floor were tagged with labels bearing the mark NANCY CORZINE. (2004 Tr. 248)

Since its first use of the NANCY COR-ZINE mark, C & C has heavily advertised its products under the NANCY CORZINE mark and expended a substantial sum of money on this advertising. The NANCY CORZINE mark has been advertised in such publications as House and Garden (C & C Ex. 273), Southern Accents (C & C Ex. 482), Veranda (C & C Ex. 483), Decor and Style and W Magazine. (C & C Ex. 313)(2004 Tr. 36–39). In a House and Garden Article, the magazine stated that NANCY CORZINE has "set the standard for California glamour for decades."

The NANCY CORZINE mark is highly regarded in the furniture business, among interior designers and end users and is known to represent the source of high quality furniture, fabrics and furniture accessories. Interior designers consider NANCY CORZINE product to be "high end" (2004 Tr. 196) and "quality product."

(2004 Tr. 264). Another nationally renowned interior designer, Andrew Gerhard, stated: "in the industry, or in the circles I travel in [the name NANCY CORZINE] is known for quality; it is known for being dependable and for the fact that she does take care of things if anything goes wrong." (2003 Tr. 81). Therefore, the NANCY CORZINE mark has acquired secondary meaning.

In either 1990 or 1991, Janet Greenberg and Steve Turner approached Nancy Corzine concerning representation of C & C's merchandise in Florida by Turner Greenberg. When Nancy Corzine visited the Turner Greenberg showroom around the time the parties began their relationship, Turner Greenberg did not have any product on its showroom floor that she believed was directly competitive with the NANCY CORZINE product. However, Turner Greenberg did represent other manufacturers' lines of furniture and accessories. Turner Greenberg contends that Nancy Corzine was on notice as a result of her visit. Had Turner Greenberg represented the same or similar products, C & C contends it would not have entered into the Contract with Turner Greenberg. (2004 Tr. 34–35, 69).

A NANCY CORZINE representative showroom receives a standard commission for the sale of NANCY CORZINE furniture (25%) and NANCY CORZINE fabrics, accessories and lamps (20%). (2004 Tr. 16). The showroom commission is calculated from the "designer net" price, which is the price that the designer pays to the showroom for the merchandise. (2004 Tr. 18).

Initially, C & C authorized Turner Greenberg to sell NANCY CORZINE fabrics, and provided Turner Greenberg with a NANCY CORZINE fabric display station, which bore the NANCY CORZINE mark, which was used as a point of pur-

chase display in the Turner Greenberg showroom.(2003 Tr. 103). Later, Turner Greenberg was provided with the NANCY CORZINE furniture catalog and began selling items from that catalog. (1999 Tr. 38–39). However, Turner Greenberg had not yet been given showroom floor samples. (1999 Tr. 39).

On September 13, 1993, the parties entered into a written agreement (the "Contract") whereby Turner Greenberg was to act as C & C's representative in Florida, the Caribbean, and parts of South America. (TG Ex. 4). The contract specifically provided that Turner Greenberg would "represent and promote SUPPLIERS [C & C's] interest in Florida, Caribbean, and sections of South America for all residential sales." (TG Ex. 4)(emphasis added). The Contract remained in effect for the period beginning on September 13, 1993 until December 5, 1995 and was not amended at any time during this period. (1999 Tr. 49–50). The Contract was terminable by either party by giving sixty (60) days written notice. (TG Ex. 4).

Upon execution of the Contract, C & C provided Turner Greenberg free of charge with approximately $300,000.00 worth of showroom floor samples (2004 Tr. 17) manufactured by C & C under the name NANCY CORZINE for the exclusive purpose of representing C & C's interests pursuant to the Contract. Those floor samples were consigned to Turner Greenberg and remained the property of C & C, as specifically stated in the Contract. (TG Ex. 4). Turner Greenberg was prohibited by the Contract from selling the actual floor samples without prior permission. (TG Ex. 4). This initial shipment of consigned goods fulfilled the Contract's requirement, and the Contract did not require that C & C ship additional consignment goods to Turner Greenberg in 1995. (1999 Tr: 130, 2004 Tr. 103, 106)

Also for the exclusive purpose of representing C & C's interests pursuant to the Contract, C & C provided Turner Greenberg with a two volume catalog containing photographs of C & C's merchandise manufactured under the name NANCY CORZINE, as well as similar "hand out tearsheets" that can be given to customers. Each of the tearsheets and catalog pages bore the NANCY CORZINE mark, and also listed the NANCY CORZINE product name and product number. (C & C Ex. 272).

C & C also provided Turner Greenberg with "finish samples," "fabric samples" and a price list for its furniture, fabrics, and furniture accessories for the exclusive purpose of representing C & C's interests pursuant to the Contract.

Turner Greenberg customers order furniture that they have viewed either on the showroom floor or in a manufacturer's catalog. (1999 Tr. 34–35). One designer, Danielle DePerro, testified that "[w]hat usually takes place is I walk through the showroom with the client, and if there's a piece we're interested in, we inquire about it." (2004 Tr. 193). Former Turner Greenberg salesperson George Graves testified that the presence of showroom pieces was important because the primary way for customers to look at product was to walk around the showroom looking at furniture, and that the secondary method was to view a manufacturer catalog. (2004 Tr. 242). Former Turner Greenberg salesperson Sandy Falk stated "In most cases they just look at it, sit in it or look at it and touch it and like it and buy it." (1999 Tr. 565).

The Contract required Turner Greenberg to obtain authorization from C & C before selling any NANCY CORZINE products from the showroom floor. (TG Ex. 4). If items are sold off the floor, it negatively impacts sales of those items

because the items are not available to be viewed by customers. (2004 Tr. 112)

During the period of Turner Greenberg's representation of NANCY CORZINE, Turner Greenberg achieved approximately $3,000,000.00 in sales of NANCY CORZINE product (2004 Tr. 98), which constituted forty percent (40%) of Turner Greenberg's total sales. (2004 Tr. 126). Turner Greenberg expanded the showroom for the purpose of opening a NANCY CORZINE gallery. Turner Greenberg contends that this was done at Defendant/Counter–Plaintiff's request. Defendant/Counter–Plaintiff contends that Turner Greenberg undertook the expansion due to the excellent sales of NANCY CORZINE product. The parties anticipated that the new expanded showroom would open on August 1, 1995.

In July of 1995, just prior to the end of its fiscal year, C & C asked for an inventory of showroom floor samples consigned to TURNER GREENBERG but was never provided with one. (1999 Tr. 74, 115, 2004 Tr. 84). Janet Greenberg testified that it would have been a simple matter to prepare the requested inventory, but that Turner Greenberg was advised by its attorneys not to provide the inventory to C & C. (2004 Tr. 140). No written opinion or other communication to that effect was ever offered into evidence by Turner Greenberg.

On July 25, 1995, C & C sent to Turner Greenberg a proposed new contract which was to run concurrently with Turner Greenberg's lease for the expanded showroom space. (2004 Tr. 25)(TG Ex. 21). C & C proposed the new agreement believing that was something that Turner Greenberg wanted. (2004 Tr. 24–25). This proposed agreement contained a number of provisions which were new or different than those contained in the 1993 Contract. One such provision stated: "[Turner Greenberg] agrees not to reproduce, have

reproduced, or represent any specific reproduction where supplier has an exclusive proprietary right to any design of supplier's entire line of furniture, fabrics, lamps and accessories, during the five year term of this agreement, or for five years after the term of this agreement has expired." (2004 Tr. 27).

Turner Greenberg concluded that the new terms were unacceptable. In addition to forbidding reproductions, the new contract would give Defendant/Counter–Plaintiff more control over the display of merchandise in the showroom and imposed road program obligations which Turner Greenberg found too expensive. According to Plaintiffs/Counter–Defendants, Defendant/Counter–Plaintiff implied that the delivery of consignment goods would be delayed until the execution of the new contract.

However, the evidence in the record shows that it was Turner Greenberg that failed to pick up the consignment furniture from C & C's loading dock. On August 2, 1995, C & C told Turner Greenberg that the additional consignment goods were available to be picked up, but that Turner Greenberg's trucking company told C & C that Turner Greenberg had placed the pickup on hold, and C & C asked "what is going on?". (C & C Ex. 350). On August 3, 1995, Turner Greenberg's trucking company confirmed to C & C in writing that Turner Greenberg had put the pickup on hold. (C & C Ex. 349).

On the same date, August 3, 1995, Turner Greenberg's attorney, Neil Berman, sent a letter to Suzy Garfield of C & C, which said: "Thank you for faxing me copies of the agreement earlier today. In response to your questions concerning a shipment of furniture to Turner Greenberg Associates, Inc., Turner Greenberg will neither pay for transportation of the merchandise, nor accept delivery of same." (C

& C Ex. 358). Not only does this letter contradict Turner Greenberg's argument that C & C was at fault for the consignment goods not being picked up, but it also disproves the argument that C & C was not communicating with Turner Greenberg, as Mr. Berman's letter makes clear that he was able to communicate back and forth with C & C. Finally, C & C attorney Jay Coggan sent a letter to Mr. Berman on September 12, 1995 that stated "your client has failed to pick up the consignment for the showroom for a substantial period of time ... why is it that your client has not taken delivery, but rather has put older and mixed product in the area that had been set aside for my client's merchandise?" (C & C Ex. 356). Based on all of the foregoing, the Court finds that Turner Greenberg was responsible for the failure to pick up the additional consignment goods preventing the opening of the expanded NANCY CORZINE gallery in 1995.

Turner Greenberg began selling numerous items of NANCY CORZINE furniture off its showroom floor beginning in August 1995. (2004 Tr. 106, 132). Both Janet Greenberg and Steve Turner admitted that during the pendency of the Contract, Turner Greenberg sold samples of NANCY CORZINE product from their showroom floor and both Janet Greenberg and Nancy Corzine confirmed that these sales were made without authorization from C & C. (1999 Tr. 64, 82, 101, 118, 125, 139). These sales were the subject of the findings issued by Judge Roettger on April 7, 1999. This Court adopts those conclusions and will not discuss these facts further.

Shortly after the termination of the Contract, C & C discovered that Turner Greenberg had previously and was still diverting sales of NANCY CORZINE products to third party manufacturers, primarily one called Meshcorp ("Mesh"), and another called Keller Williams. The diver-

sion of orders took two primary forms. First, Turner Greenberg offered "imitations" of C & C's merchandise from these third-party manufacturers. Second, Turner Greenberg was taking orders for C & C merchandise and misrepresenting to customers that what they were purchasing was genuine NANCY CORZINE merchandise, but Turner Greenberg was in fact delivering "imitation" merchandise to these customers.

Former Turner Greenberg salesperson Barbara Schweitzer testified that in the latter part of 1995, while the parties were still under contract, Steve Turner instructed the sales staff not to put the NANCY CORZINE name on orders, but rather to leave the order blank and place it on his desk. (2004 Tr. 244–45). Ms. Schweitzer further testified that designers that had placed these orders were of the impression that they would be receiving NANCY CORZINE product. (2004 Tr. 244)

Mesh did not have a full price list and usually Mesh would not quote to Turner Greenberg a net price, but instead would quote simply the cost that Turner Greenberg would pay to Mesh. (2004 Tr. 149). Also, Mesh's prices generally were much lower than those of C & C, so that Turner Greenberg was able to make additional profit, at the expense of the designer, by paying a lower price to Mesh for manufacture, with the designer paying the higher price for the NANCY CORZINE product he or she thought had been ordered. When questioned on this price differential, former Turner Greenberg salesperson George Graves stated that he would not change the price to the lower Mesh figure because he was scared that "the customer would have thought something was wrong if I had priced it so inexpensively. He would have questioned the quality of it ...." (2004 Tr. 237).

Turner Greenberg calculated its "commission" based upon the difference between what it paid for the product and how much the designer paid Turner Greenberg for that product. (2004 Tr. 152–153). Defendant/Counter–Plaintiff contends that the ability to earn a greater profit led Turner Greenberg to begin sending orders for NANCY CORZINE goods for production at Mesh.

Beginning in 1993, orders of numerous Turner Greenberg customers that had viewed and selected NANCY CORZINE furniture for purchase were diverted to other manufacturers, including Mesh Corp. Plaintiffs/Counter–Defendants contend that orders were placed with other manufacturers because of delays in production with Defendant/Counter–Plaintiff with the consent of the customers. However, the evidence produced at trial supports the position of C & C. The instances are too numerous to accept Plaintiffs/Counter–Defendants contention that these were the result of mistakes. Further, the testimony of impartial witnesses belie claims of mistake.

Although at least one of these sales was diverted with the knowledge of the customer, the customer was informed at the insistence of Barbara Schweitzer. Furthermore, Turner Greenberg provided no evidence that it made similar contact with any other customers. Numerous sales were diverted without the knowledge or consent of the customer. Examples of such conduct are set forth below.

On November 10, 1993, Turner Greenberg filled out a purchase order for two Plaza Chairs, a NANCY CORZINE product name. The order, however, was sent to Mesh for production, despite the fact that Mesh does not have a Plaza chair on its price list. (C & C Ex. 231, TG Ex. 25).

On December 6, 1993, Turner Greenberg wrote a purchase order to Mesh for a Jarrett Bench, a NANCY CORZINE product name, with a NANCY CORZINE product number (3004–30) and a request for a NANCY CORZINE finish (NC 67) (C & C Ex. 86). Given that this order was written in 1993, less than three months after the Contract went into effect, it is not plausible to believe that this use of a NANCY CORZINE product name, product number and finish description was due to mistake or confusion.

In September 1994, a Turner Greenberg customer sent an order to Steve Turner for Plaza Arm Chair and Plaza Side Chairs, which are NANCY CORZINE product names. The order, however, was sent to Mesh for production, despite the fact that Mesh does not have a Plaza chair on its price list. (C & C Ex. 163).

On May 24, 1995, Turner Greenberg sales representative Sandy Falk wrote up a purchase order for a "Wing Chair," which was a NANCY CORZINE product name. The order, however, was sent to Mesh, which did not utilize the product name "Wing" on its price list. (1999 Tr. 544–45, C & C Ex. 16).

On or about June 2, 1995, Turner Greenberg customer Direct Interiors, through designer Danielle DePerro, submitted a purchase order for a NANCY CORZINE Harlow Vanity (C & C Ex. 113, 272GG). Turner Greenberg, however, sent the order to Mesh for production. Janet Greenberg testified that although Direct Interiors placed the order for NANCY CORZINE, the order had to be resubmitted by Danielle DePerro, who knew that the order was going to be manufactured by Mesh. Ms. DePerro, however, testified that she never intended to order anything other than a NANCY CORZINE product, that she never authorized the order to be changed from NANCY CORZINE to Mesh, and that nobody from Turner Greenberg ever asked her permission to make the switch. (2004 Tr. 198).

Janet Greenberg testified that the use of the Corzine product name and number on this latter order "was a mistake." (1999 Tr. 514).

On or about June 2, 1995, Turner Greenberg filled out a purchase order for four Wing Chairs, a NANCY CORZINE product name. The order, however, was sent to Mesh for production. (C & C Ex. 239).

On or about August 17, 1995, Turner Greenberg took an order from an interior designer named Eileen Plasky for two NANCY CORZINE Napoleon chairs. However, in or about December 1995, Ms. Plasky, believing that she had ordered NANCY CORZINE product, called C & C to complain about the poor quality of the goods that she had received from Turner Greenberg. When C & C searched its records, it had no information regarding this purchase. The reason that it had no information is because Turner Greenberg had instead sent the order to Mesh for production. (C & C Ex. 71, 148, 178). Ms. Plasky testified that it was her specific intent to order NANCY CORZINE chairs and that they ordered the chairs because her client saw the floor sample in the Turner Greenberg showroom and liked it. (2004 Tr. 276–77).

During the 1999 trial phase, regarding this order, Janet Greenberg testified that there was confusion regarding these chairs and, during Turner Greenberg's relationship with C & C, some orders that should have gone to C & C went to Mesh. (1999 Tr. 509). Turner Greenberg salesperson Sandy Falk testified that Ms. Plasky specifically requested that Ms. Falk order NANCY CORZINE pieces. (1999 Tr. 559). When questioned regarding the reason for this change in the order, Diane Paolucci, Turner Greenberg's bookkeeper, testified that "I would have been advised of that and told to write it up like this because I don't know the difference between a Napoleon and a Lester chair."

(1999 Tr. 399). Paolucci further testified that she would have been advised to change the order either by the salesperson, Steve Turner or Janet Greenberg. (1999 Tr. 400). The placement of this order with Mesh instead of C & C was not a mistake. Turner Greenberg told Ms. Plasky to send Turner Greenberg a portion of the fabric for the chairs, instead of sending it to C & C, as would be customary. Also, additional fabric for the same order initially was sent to C & C, but Turner Greenberg requested that it be sent back. (2004 Tr. 291).

On or about August 23, 1995, Turner Greenberg filled out a purchase order for Napoleon Chairs, a NANCY CORZINE product name, using a NANCY CORZINE product number. The order, written by Sandy Falk, was sent to Mesh for production despite the fact that the order utilized the NANCY CORZINE product number. (C & C Ex. 151).

On or about August 29, 1995, Turner Greenberg salesperson Barbara Schweitzer filled out a purchase order for a Napoleon Lounge Chair, a NANCY CORZINE product name, which also utilized the NANCY CORZINE product number. The order, however, was sent to Mesh for production. (C & C Ex. 173).

On or about August 29, 1995, Turner Greenberg submitted an order for a Cohen Accessory Table, a NANCY CORZINE product name. On the purchase order, the name NANCY CORZINE is crossed out and replaced with "Mesh." (C & C Ex. 109, 154, 156). Sandy Falk testified that, for this order, the customer had asked for a NANCY CORZINE piece, but Ms. Falk did not remember whether she called the customer to inform her that they were sending the order to Mesh. (1999 Tr. 547). When questioned as to why "NANCY CORZINE" was crossed out, Diane Paolucci stated, "I would have done it if I was

advised to do it. I would not make a decision like this on my own." (1999 Tr. 416).

When discussing a different order, however, Janet Greenberg contradicts Diane Paolucci's testimony by explaining that in that instance, the customer wanted NANCY CORZINE but was given Mesh because "it got into the office and Diane didn't know that and she placed the order with Mesh." (1999 Tr. 508). The Court resolves this conflict in the testimony in favor of that given by Ms. Paolucci, and finds that the change of this order (and other orders) was not a mistake by Diane Paolucci, but rather was intentionally ordered by either Steve Turner or Janet Greenberg.

On or about August 29, 1995, Turner Greenberg submitted to Mesh for production an order for a Laurel Desk utilizing a photograph of a NANCY CORZINE catalog page with certain identifying marks eliminated. Sandy Falk testified that when placing this order the customer intended to order a NANCY CORZINE piece, and that she could tell because the Nancy Corzine product number was on the order. (1999 Tr. 557, C & C Ex. 143). Sandy Falk generally stated that if she used a NANCY CORZINE item name and number she was trying to advise C & C which item of NANCY CORZINE product she wanted. (1999 Tr. 561).

In or about September 1995, Turner Greenberg took an order for a Laughton End Table, which is a NANCY CORZINE product name. The order, however, was sent to Mesh for production. Diane Paolucci could not say why Turner Greenberg ordered the item from Mesh Corp. with a NANCY CORZINE name. (1999 Tr. 404, C & C Ex. 81).

On or about September 13, 1995, Turner Greenberg wrote up a purchase order for production by Mesh. However, the three furniture items being ordered (Bateau Loveseat; Acorn Lounge Chair and Laurel Accessory Table) all were identified using NANCY CORZINE names and catalog numbers. (C & C Ex. 125, 126, 272ii, 272jj).

On or about September 14, 1995, Turner Greenberg filled out a purchase order for Plaza Side Chairs, which is a NANCY CORZINE product name. However, the order was sent to Mesh for production, despite the fact that Mesh does not have a Plaza chair on its price list. (C & C Ex. 227).

On or about September 19, 1995, Turner Greenberg submitted to Mesh for production an order for a Laurel Desk, a NANCY CORZINE product name, utilizing the NANCY CORZINE product number on the purchase order. (C & C Ex. 145).

On or about September 19, 1995, Turner Greenberg submitted to Mesh for production an order for a Athene Lounge Chair utilizing a photograph of a NANCY CORZINE catalog page. Sandy Falk admitted that the order utilized the NANCY CORZINE product name and number, and testified that she could not remember whether she ever told the customer that the chair would not be manufactured by NANCY CORZINE. (1999 Tr. 556, C & C Ex. 141).

In or about October 1995, Turner Greenberg took an order for a NANCY CORZINE Curtain Side Table, using NANCY CORZINE Item # 4050, and instead submitted the order to Mesh. (C & C Ex. 72, 272x). Regarding this order, Diane Paolucci could not offer an explanation as to why Turner Greenberg used a NANCY CORZINE item number and name to order from Mesh Corp. (1999 Tr. 402).

On or about October 6, 1995, a Turner Greenberg customer submitted a purchase order for a Desilva Accessory Table, a NANCY CORZINE product name, and

Turner Greenberg submitted the order to Mesh for production, utilizing a photocopy of a NANCY CORZINE catalog page. (C & C Ex. 127, 128).

In or about October 1995, Turner Greenberg introduced Dickson Reed, a company started by Turner Greenberg for the purpose of manufacturing their own line of furniture. (2004 Tr. 93) Janet Greenberg testified that Dickson Reed line was not created in order to replace NANCY CORZINE, and that the October 1995 rollout was a "coincidence in timing." (1999 Tr. 504). Barbara Schweitzer testified that Steve Turner created a Dickson Reed catalog which consisted of copies of NANCY CORZINE catalog tear sheets, without the NANCY CORZINE name on them. (2004 Tr. 245)

On or about October 10, 1995, a Turner Greenberg customer placed an order to which two different NANCY CORZINE catalog pages for the Raymond Demilune Chest and Plaza End Table were attached. This order, however, was written up as Mesh/Dickson Reed, and was sent to Mesh for production. (C & C Ex. 118). When questioned on the issue of why the designer was charged the NANCY CORZINE price when Turner Greenberg paid the lower Mesh cost, George Graves testified, "[t]he customer would have thought something was wrong if I had priced it so inexpensively. He would have questioned the quality of it . . . ." (2004 Tr. 237).

On or about October 31, 1995, a Turner Greenberg customer submitted a purchase order for a Vanessa Arm Chair, a NANCY CORZINE product name. Despite using the NANCY CORZINE product name and catalog number, the order was written up as Dickson Reed (D/R), and was sent to Mesh for production. (C & C Ex. 121).

On or about October 31, 1995, a Turner Greenberg customer submitted another purchase order for Plaza Chairs utilizing a copy of a NANCY CORZINE catalog page. The order, however, was sent to Mesh for production. (C & C Ex. 131, 132).

On or about November 17, 1995, a Turner Greenberg customer submitted an order for a Dorchester Sofa, which is a NANCY CORZINE product name. However, the order was written up as being for Dickson Reed (DR)(C & C Ex. 117).

On or about November 20, 1995, Turner Greenberg placed an order with Mesh to produce a Fountainbleu Salon Arm Chair, which is a NANCY CORZINE product name. Attached to the Mesh invoice/order acknowledgment is a photograph of the NANCY CORZINE catalog page for this item. (C & C Ex. 59).

In December 1995, a Turner Greenberg customer submitted an order for Napoleon chairs, which is a NANCY CORZINE product name. However, when Turner Greenberg sent out its purchase order to Mesh, the word "Napoleon" is crossed out and replaced with "Lester." (C & C Ex. 146). Sandy Falk testified that she was not the one that crossed out Napoleon and replaced it with Lester. (1999 Tr. 558).

The type of product made by C & C and sold by Turner Greenberg is identical, i.e., furniture, fabrics, and furniture accessories. The actual furniture made and sold by C & C is similar to that in connection with which Turner Greenberg used the mark NANCY CORZINE, as Turner Greenberg had manufacturers make furniture that imitated NANCY CORZINE furniture.

Both C & C and Turner Greenberg advertise via catalog, by displaying furniture in showrooms, and in various trade publications. Also, C & C and Turner Greenberg sell product through the same trade channels to the same class of purchasers: interior designers and design professionals.

George Graves testified that, after the Contract terminated, NANCY CORZINE items remained on Turner Greenberg's showroom floor, that customers looked at the NANCY CORZINE items, and the customers who saw the NANCY CORZINE furniture would become interested in it. Turner Greenberg would either sell the customer the item off the floor, or they would direct the customer to another manufacturer, but did not place the order with C & C. (2004 Tr. 218, 228–29)

Turner Greenberg also told its customers that it could have NANCY CORZINE furniture made by other manufacturers for a cheaper price. Interior designer Brooke Huttig testified that in 1997, while shopping at Turner Greenberg, Steve Turner showed her the NANCY CORZINE catalog and told her that he could get her the same chairs made more cheaply that were "copied exactly by another manufacturer in California." (2004 Tr. 270).

Turner Greenberg's conduct of showing NANCY CORZINE products and the NANCY CORZINE catalog to customers for the purpose of placing orders with third party manufacturers continued after the time that the Contract was terminated on December 5, 1995. Examples of such conduct are set forth below.

On December 11, 1995, Turner Greenberg submitted to Mesh for production an order for a Blenheim End Table. Sandy Falk acknowledged that this order utilized the NANCY CORZINE product name and number. (1999 Tr. 554, C & C Ex. 137, 138).

In or around January 1996, Turner Greenberg submitted an order to Mesh for production utilizing NANCY CORZINE product names and numbers (90030 Swirl Headboard, 6015–40 Crescent Chest). (C & C Ex. 134, 135).

On or about January 24, 1996, Turner Greenberg wrote up an order for Mesh/Dickson Reed for a "Pompeii" coffee table, a NANCY CORZINE product name, and used the NANCY CORZINE product number. (1999 Tr. 422, C & C Ex. 111,130).

In or about February 1996, Turner Greenberg submitted to Mesh an order for a Vicomte Headboard, a NANCY CORZINE product name, by attaching a page from the NANCY CORZINE catalog and also utilizing a NANCY CORZINE product number. (1999 Tr. 406, C & C Ex. 88, 193). Janet Greenberg testified that the use of the NANCY CORZINE catalog page after the contract was terminated in December 1995 would be "either a mistake or in contravention to instructions." (1999 Tr. 500).

In April 1996, Turner Greenberg submitted to Mesh an order for two Country Pompeii Commodes, a NANCY CORZINE product name, by attaching a page from the NANCY CORZINE Catalog. (1999 Tr. 414, C & C Ex. 104, 187, 188). Diane Paolucci was unable to explain why the Corzine catalog page was attached to an order sent to Mesh. (1999 Tr. 415).

When the parties' contractual relationship ended in 1995, Turner Greenberg retained possession of C & C's showroom floor samples. The events concerning the consigned furniture after the termination of the relationship were set forth by Judge Roettger in April 1999. As previously stated, this Court adopts those findings.

## CONCLUSIONS OF LAW

### a. Breach of Contract and Conversion

■ Defendant/Counter–Plaintiff raises the issues of breach of contract and conversion as both affirmative defenses and as Counts I & II of their Counterclaim. The parties were given ample opportunity in April 1999 to address the breach of contract and conversion issues fully. Judge Roettger issued findings of fact and en-

tered a final judgment. Res judicata or claim preclusion gives preclusive effect to a judgment in foreclosing relitigation of matters that were litigated or could have been litigated. *I.A. Durbin v. Jefferson National Bank*, 793 F.2d 1541, 1549 (11th Cir.1986). Since the issues of breach of contract and conversion have been addressed with respect to Plaintiffs/Counter–Defendants' Complaint and Defendant/Counter–Plaintiff's Affirmative Defenses and were the subject of a final judgment, further consideration of these issues is barred.

### b. Unfair Competition, False Designation of Origin, Palming Off, and Common Law Trademark Infringement

The legal standard for unfair competition, which includes palming off and false designation of origin, and trademark infringement under both the Lanham Act and common law has been held to be essentially the same. *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1475 n. 3 (11th Cir.1991). For this reason, courts have conducted the analysis of these claims simultaneously. *Contemporary Rest. Concepts v. Las Tapas–Jacksonville, Inc.*, 753 F.Supp. 1560, 1562 (M.D.Fla. 1991) A plaintiff is not required to possess a federal registration for its mark as a prerequisite to bringing suit. *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512–13 (11th Cir.1984).

In order to succeed in a claim for unfair competition or trademark infringement, the plaintiff must establish the following two elements: 1) valid ownership of the mark; and 2) the defendant's use of the mark in commerce creates a likelihood of confusion among consumers as to the origin of the goods. *See Alliance Metals, Inc. of Atlanta v. Hinely Indus., Inc.*, 222 F.3d 895, 906 (11th Cir.2000).

### 1. Ownership of the Mark

Ownership of a trademark can be shown by establishing actual prior use. *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir.2001). The Lanham Act defines use in commerce as:

> the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark .... [A] mark shall be deemed to be in use in commerce .. : on goods when (A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce ....

15 U.S.C. § 1127. C & C has used the NANCY CORZINE mark in commerce since as early as 1983 by affixing tags and labels bearing the mark to C & C's furniture, fabrics, and furniture accessories, by using the mark on point of purchase fabric displays, by using the mark in catalogs that display C & C's furniture, fabrics, and furniture accessories at the point of purchase for those goods, and by using the mark in advertising. No other party has used the mark NANCY CORZINE without the consent of C & C. Thus, C & C is the valid owner of common law rights to the trademark NANCY CORZINE due to its use of that mark in commerce since as early as 1983 in relation to the sale of furniture, fabrics, and furniture accessories.

Since the mark NANCY CORZINE is a surname, it is entitled to protection to the extent that it has acquired secondary meaning. *Conagra*, 743 F.2d at 1513 (11th Cir.1983). Whether a mark has acquired secondary meaning is a question

of fact. *American Television & Communications Corp. v. American Communications & Television, Inc.,* 810 F.2d 1546, 1549 (11th Cir.1987). A trademark has acquired secondary meaning when the public associates the mark with the producer, not the product itself. *Conagra,* 743 F.2d at 1513. The factors to consider when determining whether a name such as NANCY CORZINE has acquired secondary meaning are: 1) the length and manner of the use of the mark; 2) the nature and extent of advertising and promotion; 3) the efforts by C & C to promote a conscious connection in the public's mind between the name NANCY CORZINE and C & C's furniture; fabrics, and furniture accessories; and 4) the extent to which the public actually identifies the name NANCY CORZINE with C & C's furniture, fabrics, and furniture accessories. *See Id.*

■ As noted above, C & C has used the NANCY CORZINE mark in commerce since as early as 1983. C & C used the mark in advertising, including using the mark in trade publications circulated to the furniture and interior design industry and to the retail consuming public. The relevant public has come to associate the name NANCY CORZINE with the highest quality of furniture. The record shows that because of C & C's uninterrupted and exclusive use of the mark NANCY CORZINE on its furniture, fabrics, and furniture accessories since as early as 1983, C & C's mark NANCY CORZINE acquired secondary meaning and was protectable prior to the time C & C entered into the contract with Turner Greenberg. "Once secondary meaning is established in a personal name, the name may become strong and well-known, and entitled to a broad scope of protection." 1. THOMAS MCCARTHY, 2 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, at. § 13.02[1] (citations omitted). Due to the exclusive, continuous nationwide use of the NANCY CORZINE mark, it is a strong mark and entitled to broad protection.

Turner Greenberg used the NANCY CORZINE mark in commerce when it used NANCY CORZINE catalog pages and tearsheets to obtain orders from customers and sent those orders to, third-party manufacturers to obtain imitations of the NANCY CORZINE merchandise appearing in the catalog. Further, Turner Greenberg used the NANCY CORZINE mark in commerce by showing customers sample NANCY CORZINE furniture with tags or labels that bore the NANCY CORZINE mark and taking orders from customers for NANCY CORZINE furniture, but diverting those orders to third-party manufacturers to make imitation NANCY CORZINE furniture. All pages of the NANCY CORZINE catalog and tearsheets bear the NANCY CORZINE mark. This use in commerce by Turner Greenberg of C & C's protected mark NANCY CORZINE was done intentionally.

■ Furthermore, while Turner Greenberg was authorized to use the NANCY CORZINE mark in connection with its duties of representing C & C under the Contract, once the Contract terminated, Turner Greenberg's continued use of the NANCY CORZINE mark constitutes trademark infringement. "Once 'a license has expired, use of the formerly licensed trademark constitutes infringement.'" *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 143 (3d Cir.1981); *see also PGA v. Bankers Life & Cas. Co.,* 514 F.2d 665, 670 (5th Cir.1975).

#### 2. Likelihood of Confusion

■ The Eleventh Circuit has set forth a seven-point test for likelihood of confusion: 1) the strength of the plaintiff's mark; 2) the similarity between the plaintiff's mark and the accused mark; 3)

the similarity between the products and services offered by the plaintiff and defendant; 4) the similarity of the sales methods; 5) the similarity of advertising methods; 6) the defendant's intent in using a trademark that is similar to the plaintiff's trademark; and 7) consumers' actual confusion. *Alliance Metals*, 222 F.3d at 907.

In analyzing this type of mark, the Court must determine whether the mark is strong or weak in order to determine the level of protection to be extended to the mark. *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 973 (11th Cir.1983). Strong marks are given strong protection over a wide range of related products and services. *Id.* Accordingly, the rationale is that the more well-known the mark, the deeper is the impression it creates upon the public's consciousness and the greater the scope of protection to which it is entitled. *Freedom Savings & Loan Assn. v. Way*, 757 F.2d 1176, 1182 (11th Cir.1985). The evidence of record shows that C & C has used the mark NANCY CORZINE exclusively since as early as 1983, and that the NANCY CORZINE mark is highly regarded in the furniture business and has come to be associated with high quality furniture, fabric, and furniture accessories. Since 1983, C & C has heavily advertised its products under the name NANCY CORZINE. C & C's mark is a surname that has acquired a great deal of secondary meaning, making it a strong mark entitled to strong protection.

Another factor increasing the likelihood of confusion is a high degree of similarity between the marks. *Alliance Metals*, 222 F.3d at 907. The likelihood of confusion is greater when an infringer uses the exact trademark. *Philadelphia Jaycees*, 639 F.2d at 142 (3d Cir.1981). The relevant marks are identical because Turner Greenberg used the NANCY CORZINE mark to sell furniture manufactured by others.

Turner Greenberg improperly and illegally used the NANCY CORZINE mark when it used pages from the NANCY CORZINE catalog, and showed its customers NANCY CORZINE showroom floor samples having hang tags affixed thereto that bear the trademark NANCY CORZINE to obtain orders from customers that were sent to manufacturers other than C & C. This factor militates highly in favor of a finding of likelihood of confusion.

The greater the similarity between the products, the greater the likelihood of confusion. *John H. Harland Co.*, 711 F.2d at 976 (11th Cir.1983); *Exxon Corp. v. Texas Motor Exch. of Houston, Inc.*, 628 F.2d 500, 505 (5th Cir.1980). The evidence establishes that the type of products sold by the parties are identical. Indeed, Brooke Huttig testified that Steve Turner told her that he could copy NANCY CORZINE chairs exactly, only cheaper. Therefore, this factor weighs heavily in favor of a finding of likelihood of confusion.

Another factor increasing the likelihood of confusion is a high degree of similarity between the parties' sales methods. *Alliance Metals*, 222 F.3d at 907. Both C & C's furniture and the imitation furniture sold by Turner Greenberg were sold to customers who viewed samples on the showroom floor or in a catalog. Thus, the sales methods used for the goods in question are identical, and this factor weighs heavily in favor of C & C.

If a plaintiff and a defendant both use the same advertising media, a finding of likelihood of confusion is more probable. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1542 (11th Cir.1986). "The greater the similarity in advertising campaigns the greater the likelihood of confusion." *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F.Supp.2d 1261, 1267 (S.D.Fla. 1999). Both Turner Greenberg and C & C advertise via catalogs, displaying furniture

in showrooms, and in various publications distributed to the furniture and design industry and the consuming public. Thus, the advertising methods are the same. This factor weighs heavily in favor of a finding of likelihood of confusion.

If the defendant adopted the plaintiffs mark with the intent of obtaining benefit from the plaintiffs business reputation, "this fact alone may be sufficient to justify the inference that there is confusing similarity." *Carnival Corp.*, 74 F.Supp.2d at 1268. In addition to obtaining a benefit from NANCY CORZINE'S business reputation, the evidence of record shows a number of possible motivations for Turner Greenberg, the most obvious of which was Turner Greenberg's ability to make additional profits by pocketing the difference between what it charged a designer for a NANCY CORZINE piece and what it paid Mesh to manufacture that piece. As but one example, when Turner Greenberg sent the order of Carmen Aviles for a NANCY CORZINE Cohen accessory table to Mesh (C & C Ex. 109), it made a profit of $592.40 as opposed to $373.50 if it had simply placed the order with C & C. The larger number comes from a higher commission percentage (30% v. 25%), plus the difference between what Mesh charged and the higher C & C charge that Turner Greenberg passed on to the designer. This factor weighs heavily in favor of a finding of likelihood of confusion.

■ In the Eleventh Circuit, evidence that shows instances of actual consumer confusion is the best proof of likelihood of confusion. *AmBrit, Inc.*, 812 F.2d at 1543. The testimony of Eileen Plasky and Danielle De Perro demonstrate actual confusion. This factor weighs heavily in favor of a finding of likelihood of confusion.

Considering all of the factors, Turner Greenberg's actions have created a likelihood of confusion regarding the source of furniture Turner Greenberg offered to sell and actually sold in commerce to consumers bearing C & C's NANCY CORZINE mark.

■ Included among the general category of unfair competition is the more specific category of palming off. Palming off "occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S.Ct. 2041, 2045, 156 L.Ed.2d 18 (2003). The central inquiry regarding palming off, as prohibited by 15 U.S.C. § 1125, is "whether the defendant is passing off his goods or services as those of the plaintiff by virtue of substantial similarity between the two, leading to confusion on the part of, potential customers." *Monsanto Co. v. Campuzano*, 206 F.Supp.2d 1252, 1265 (quoting *Sun–Fun Prods., Inc. v. Suntan Research & Dev., Inc.*, 656 F.2d 186, 191 (5th Cir. 1981)), *modified on other grounds* 206 F.Supp.2d 1270 (S.D.Fla.2002). A likelihood of confusion must also be found to succeed on a claim of palming off. *See B.H. Bunn Co. v. AAA Replacement Parts Co.*, 451 F.2d 1254, 1262 (5th Cir.1971).

The United States Seventh Circuit Court of Appeals has defined palming off in the following way:

> [w]hen one orders parts by name of manufacturer, number, and description, he has a right to have his order filled as given, and if substitutions are made in circumstances calculated to lead the purchaser to believe he is getting what he orders when he is not, it is not only fraud upon the purchaser but also upon the manufacturer of the goods ordered for which the substitution was made. This [is] palming off . . . .

*Singer Mfg. Co. v. Golden*, 171 F.2d 266, 268 (7th Cir.1948). In *Singer*, customers contacted the defendants and requested the plaintiff's goods by name, identifying number; and description. *Id.* at 267.

However, instead of providing customers with the specified goods, the defendants supplied the customers with goods made by a different manufacturer which the Court concluded was palming off. *Id.* at 267–268.

Similarly, in *Pic Design Corp. v. Bearings Specialty Co.*, 436 F.2d 804 (1st Cir. 1971), the defendant, a distributor of industrial components, received orders from customers specifically requesting components manufactured by Pic, using either the "Pic" name or a Pic catalog number. *Id.* at 806. Instead of shipping the Pic parts to these customers, the defendant instead sent the customers parts made by another manufacturer. The First Circuit found this conduct to be "palming off in its grossest form." *Id.* at 807.

■ Passing off or palming off can be achieved merely by sending one product in response to an order for another or other methods that misrepresent the source to the buyer. *K–S–H Plastics, Inc. v. Carolite, Inc.*, 408 F.2d 54, 59 (9th Cir.), *cert. denied*, 396 U.S. 825, 90 S.Ct. 69, 24 L.Ed.2d 76 (1969). Passing off or palming off can also be achieved by using the original product as the demonstrator for selling the accused infringer's cheaper imitation. *See Crossbow, Inc. v. Dan–Dee Imports, Inc.*, 266 F.Supp. 335, 339 (S.D.N.Y.1967).

■ Palming off is clearly found here. The record contains ample evidence that customers who ordered C & C's products received other manufacturers' products without having been asked whether or not they agreed with the switch. Turner Greenberg used C & C's floor samples and catalogs that bore the mark "NANCY CORZINE" to obtain orders for C & C's furniture. However, instead of providing customers with the C & C furniture ordered, Turner Greenberg sold furniture made by other manufacturers. The testimony of Eileen Plasky and Danielle De Perro demonstrates that Turner Green-

berg used C & C's consigned showroom floor samples to sell Turner Greenberg's imitation furniture. Furthermore, the testimony of Brooke Huttig demonstrates that Turner Greenberg used the NANCY CORZINE catalog for the same purpose. Therefore, C & C has established that Turner Greenberg committed palming off, and the Court finds that this palming off was willful, and not a mistake as claimed by Turner Greenberg. As a claim of palming off requires a showing of a likelihood of confusion, *see B.H. Bunn Co.*, 451 F.2d at 1262, this Court relies on the conclusions set forth in section 2, *supra.*

Thus, for the reasons set forth above, Turner Greenberg is liable for common law trademark infringement, unfair competition, false designation of origin and palming off.

■ Plaintiffs/Counter–Defendants Steve Turner and Janet Greenberg are individually liable for trademark infringement, unfair competition, false designation of origin, and palming off. A corporate officer is personally liable if he or she personally took part in infringing activities or specifically directed employees to do so. *Chanel*, 931 F.2d at 1477; *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir.1978). In *Chanel*, a corporate officer personally purchased counterfeit goods, advertised these goods as genuine in local publications, and operated the showroom from which the goods were sold. *Chanel*, 931 F.2d at 1478. Finding this corporate officer personally liable, the *Chanel* court held "[i]f an individual actively and knowingly caused the infringement, he [or she] is personally liable." *Id.* at 1477.

The evidence shows that Steve Turner and Janet Greenberg were personally re-

sponsible for and directed Turner Greenberg's acts of unfair competition, false designation of origin, palming off, and common law trademark infringement. Diane Paolucci testified that she would not change an order from C & C to Mesh unless she was directed to do it. Barbara Schweitzer testified that Steve Turner told the sales staff to leave the manufacturer space on purchase orders blank and place the order on his desk. Brooke Huttig testified that Steve Turner told her that Turner Greenberg could have NANCY CORZINE items copied exactly for less money. Furthermore, Turner Greenberg was a small company, and its principals oversaw every aspect of its operation. Because of their personal involvement in the infringing acts of Turner Greenberg, Steve Turner and Janet Greenberg should be held personally liable.

■ Plaintiffs/Counter–Defendants contend that it should not be held liable as Defendant/Counter–Plaintiff has unclean hands. In order to establish this defense, Turner Greenberg must prove the following two requirements: 1) the wrongdoing is directly related to the claim against which the defense is being asserted; and 2) Turner Greenberg was "personally injured" by C & C's conduct. *Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 450–51 (11th Cir.1993); *Inmuno Vital, Inc. v. Golden Sun, Inc.,* 49 F.Supp.2d 1344, 1358 (S.D.Fla.1997). Although Turner Greenberg has attempted to offer evidence including that regarding an "Aragon Project" and a "Hanwah Hotel Project" that purported to demonstrate C & C's unclean hands, Turner Greenberg has not introduced any evidence to support this defense that relates to the dispute between C & C and Turner Greenberg. Therefore, Turner Greenberg has not satisfied the first prong of the test. Second, Turner Greenberg has not shown that it was harmed in any way by C & C's conduct regarding the "Aragon Project" or the "Hanwah Hotel

Project." Therefore, this defense will not serve as a bar to C & C's recovery.

Accordingly, it is

**ORDERED AND ADJUDGED as follows:**

1. Defendant/Counter–Plaintiff's claims for breach of contract and conversion are barred by the final judgment entered on April 28, 1999.

2. Plaintiffs/Counter–Defendants are liable for trademark infringement, unfair competition, false designation of origin, and palming off.

3. Liability having been established by this order, the remaining issue of damages will be addressed following the receipt of submissions by the parties in accordance with their representations to the Court. (2003 Tr. 19). Each party shall provide a memorandum including any applicable exhibits to the Court within ten days of this order. The parties are to advise the Court whether oral argument is requested.